**TRANSPORTATION ALTERNATIVES, INC., Plaintiff–Appellee,**

v.

**CITY OF NEW YORK and Henry J. Stern, Commissioner of the New York City Department of Parks and Recreation, Defendants–Appellants.**

**Docket No. 02–9012.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 25, 2002.

Decided: Aug. 8, 2003.

Christopher Dunn, New York Civil Liberties Union (Arthur Eisenberg, Donna Lieberman, on the briefs), New York, NY, for Appellee.

Scott Shorr (Barry P. Schwartz, on the brief) for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, for Appellant.

Before: WALKER, Chief Judge, LEVAL and CALABRESI, Circuit Judges.

LEVAL, Circuit Judge. ·

This suit, brought against The City of New York and its Commissioner of Parks and Recreation by an organization which conducts events in the City's parks presents a constitutional challenge to the fees charged by the City for such events. The United States District Court for the Southern District of New York (Scheindlin, *J.*) issued a declaratory judgment that the city's fee-setting scheme for "special events" held on park property violates the First Amendment's guarantee of free speech, enjoined its enforcement against the plaintiff, and awarded compensatory damages to reimburse the plaintiff for fees it had paid under the challenged schemes. We affirm the district court's judgment.

## BACKGROUND

### *"Special Event" Fees in New York City Parks*

The New York City Department of Parks and Recreation owns and manages more than 1,700 parks and other facilities within the city of New York. Any group that wishes to hold an event in a New York City park (or any other piece of property administered by the department) must obtain a permit, for which it must pay a fee of $25. In addition, the City charges fees for a license to vend on park property and for services provided by the parks department (such as stage rentals). It also requires some groups to post refundable clean-up, restoration, or security bonds. None of these fees is challenged in this lawsuit.

The suit challenges an additional fee charged by the City for what it calls "special events" occurring on park property. Special events are defined by city rules as follows:

> "Special Event" means a group activity including, but not limited to, a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic involving more than 20 people or a group activity involving less than 20 people for which specific space is requested to be reserved.

56 R.C.N.Y. § 1–02 (2001).

Prior to April of 2001, there was no schedule or regulation governing either the decision whether to impose a special event fee or the determination of the amount of such a fee. The only pertinent document was a publication of the Parks Department entitled "Top Ten Considerations in Evaluating Events Held in New York City Parks: A Guide for Determining Contributions." This document listed ten considerations,[1] but did not assign any weight, either absolute or relative, to any of the listed factors.

---

1. The conditions listed were:
 1. What is the impact of the event on the park? Will it affect the normal use of the park?
 2. When and where will the event take place?
 3. Recent and relevant precedent.
 4. Will Parks need to provide production assistance and/or security for the event? What is the total cost to Parks?
 5. How much time will be needed for set-up and break down?
 6. How many people are expected to attend the event? .
 7. What is the primary purpose of the event, public benefit or corporate promotion?
 8. What type of product is being promoted?*
 9. Is the event consistent with the image of Parks?
 10. Will music or noise interfere with people residing or working near the park?

 * According to general practice, the promotion of alcohol and/or tobacco products is prohibited.

Under this system, between 1997 and 2000, the city charged individuals and organizations a wide range of special event fees—ranging from $500 (for the September, 2000 "Sickle Cell Anemia Walk" in Central Park) to $650,000 (for the August, 2000 "Earthshare Concert" in Prospect Park) to "one horse" (for an April, 1999 celebration of Shakespeare's 435th birthday). In many instances, these fees were charged for the use of the parks for traditional expressive activities, such as the 2000 Earth Day event in Battery Park ($10,000 fee) and a speech by the Dalai Lama in August, 1999 ($7,500 fee). Pursuant to this scheme, the City charged plaintiff fees of $5,500 and $6,000 in 1999 and 2000 respectively.

In April of 2001, the city promulgated formal rules governing special event fees, codified as § 2–10 of Chapter 56 of the Rules of the City of New York, 56 RCNY § 2–10(a–g). Section 2–10 lists eleven factors, which "shall be taken into consideration" in determining the fee to be charged. The list of factors is:

1. the length of time, time of day and time of year of the event;

2. the nature of the use;

3. the number of persons expected to attend the event;

4. whether the applicant will impose an admission charge;

5. the size and type of the proposed venue;

6. the types and extent of public resources required to stage the event;

7. the potential for damage to the park or disruption of other park activity;

8. whether the event is a charitable event;

9. whether the event is held for the purpose of raising funds;

10. the amount and nature of advertising, including whether the event has title sponsorship; and

11. such other information as the Commissioner shall deem relevant.

56 R.C.N.Y. § 2–10(g). No weight is assigned to any factor.

Section 2–10 also fixes the maximum fee that may be charged. The maximum varies based on the location of the event (e.g. community park, regional park, Central Park), whether the event is "public" or "private," and whether the event enjoys "commercial sponsorship." For example, a private event in Central Park with commercial sponsorship may incur a fee up to $125,000, while the same event without commercial sponsorship is limited to a $50,000 fee. The table of maximum fees is set forth below.

### Maximum Special Event Fees

| Type of Event | Community Park | Regional Park | Central Park | Facility |
|---|---|---|---|---|
| Private Event without Commercial Sponsor | $25,000 | $ 37,500 | $ 50,000 | $ 50,000 |
| Private Event with Commercial Sponsor | $65,000 | $100,000 | $125,000 | $125,000 |
| Public Event without Commercial Sponsor | $10,000 | $ 20,000 | $ 25,000 | $ 25,000 |
| Public Event with Commercial Sponsor | $50,000 | $ 75,000 | $100,000 | $100,000 |

56 R.C.N.Y. § 2–10(f).

According to the regulation, an event is deemed to have "commercial sponsorship" (1) "where a for-profit entity is the permittee [or] primary host, [or] has contributed to underwriting the cost of an event," or (2) where the "trade name, trademark or logo [of a for-profit entity] appear[s] in advertising associated with the event." 56 R.C.N.Y. § 2–10(a).

### Transportation Alternatives and the 2001 NYC Century Bike Tour

Plaintiff Transportation Alternatives ("TA") is a non-profit advocacy group that seeks to promote bicycling, walking, and the reduction of automobile use in New York City. It has over 5,000 members and seven full-time employees. Founded in 1973, Transportation Alternatives is a leading regional advocate for cycling, responsible for such accomplishments as a bike lane on Second Avenue and legal bike access on New York City subways and commuter railroads.

For the last 13 years, TA has annually sponsored the New York City Century Bike Tour. Participants ride through the city on pre-arranged routes of up to 100 miles. TA uses the Bike Tour as a fundraiser and an opportunity for advocacy in support of TA's goals. At rest stops along the way, for example, participants are urged to sign petitions advocating a car-free Central Park; many riders wear shirts with slogans such as "One Less Car"; riders in the 2000 tour were given pro-bike postcards and urged to mail them to city officials.

The Century Bike Tour begins and ends in Central Park; its route passes through a number of areas under the control of the Parks Department. Though riders can join the tour at any point along the way without charge, TA encourages participants to register for the event and pay a fee, which goes directly to advance the organization's advocacy efforts. TA also solicits donations during the event.

In preparation for the event, TA solicits and receives monetary and in-kind donations from various corporate sponsors. For example, Transportation Alternatives volunteers pass out free Clif Bars (a type of energy bar) to riders, and any rider who returns to Central Park at the end of the ride is treated to a free cup of Ben & Jerry's ice cream, dispensed from a Ben & Jerry's truck located inside the park. (The ice cream is not offered for sale.) To recognize this support, TA lists the names of corporate sponsors and reproduces their logos in printed materials associated with the event and on its website.

For the 1999 and 2000 tours, the city charged Transportation Alternatives $5,500 and $6,000, respectively, in special events fees. (These fees were levied before the promulgation of the 2001 rules; the fees were set in accordance with the "Top Ten Considerations" listed above.) After the promulgation of § 2–10, the group requested a meeting with department representatives to discuss the fee it would pay for the 2001 tour. At this meeting, representatives of Transportation Alternatives expressed the belief that the group should be required to pay only the $25 permit fee. The Parks Department disagreed: In a letter dated July 11, 2001, department representatives informed Transportation Alternatives that the fee for the 2001 tour would, like the previous year's fee, be $6,000. However, the letter went on to make the following offer:

If you remove the corporate elements of your event, specifically the Ben and Jerry's presence and the Clif Bar sampling, and make the entrance fee simply a suggested donation, on all your litera-

ture including your website, then you will only be required to pay the permit application fee of $25.00 and post the appropriate insurance bond.

TA chose not to forego corporate sponsorship for the 2001 tour; rather, it paid the $6,000 fee and promptly filed this lawsuit in the district court. The complaint initially challenged the constitutionality of § 2–10 only. It was later amended to add a challenge to the scheme under the Guide for Determining Contributions, which preceded the promulgation of § 2–10, seeking recovery of the fees paid by Transportation Alternatives for its Bike Tours conducted in 1999 and 2000. Both parties moved for summary judgment. The District Court granted summary judgment to the plaintiffs on August 20, 2002.

## DISCUSSION

We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving party. See *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### A. Broad Discretion

 A fee as a condition on an assembly or demonstration in a public park is a prior restraint on speech, see *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), and as such faces a "heavy presumption" of invalidity, *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The Supreme Court, on the other hand, has recognized that "government, in order to regulate competing uses of public forums, may impose a permit requirement on those wish-

ing to hold" expressive events, such as "march[es], parade[s], or rall[ies]." *Forsyth*, 505 U.S. at 130, 112 S.Ct. 2395 (citing *Cox v. New Hampshire*, 312 U.S. 569, 574–76, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)). Through such a requirement, government may regulate the "time, place, and manner" of demonstrative public events, on the condition that the restrictions "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Id.*, 505 U.S. at 130, 112 S.Ct. 2395 (citing *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). Such regulations, furthermore, "may not delegate overly broad licensing discretion to a government official." *Id.* (citing *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)).

In *Forsyth*, the Supreme Court held unconstitutional a Georgia county ordinance, which provided for a fee of "not more than $1000" for "the issuance of permits for parades, assemblies, demonstrations, road closings, and other uses of public property and roads by private organizations and groups of private persons for private purposes." 505 U.S. at 126, 112 S.Ct. 2395. The ordinance authorized the county administrator to "adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." *Id.* at 126–27, 112 S.Ct. 2395. Pursuant to this scheme, the county sought to charge the plaintiff a permit fee of $100 for a two-hour rally to be held on the steps of the county courthouse. This fee, both parties stipulated, was based exclusively on the costs associated with processing the application. The plaintiff refused to pay the fee and instead brought a facial challenge to the ordinance. *Id.* at 127, 112 S.Ct. 2395.

The Supreme Court ruled the ordinance unconstitutional on its face. It explained, "A government regulation [of a public demonstration] that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Id.* at 130, 112 S.Ct. 2395 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). "To curtail that risk," the Court held, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain 'narrow, objective, and definite standards to guide the licensing authority.' " *Id.* at 131, 112 S.Ct. 2395 (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)). If the scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority," it is unconstitutional. *Id.* (internal citations and quotation marks omitted).

 Section 2–10 vests exactly this sort of impermissible discretion in the Parks Commissioner. As an initial matter, the Commissioner has unrestricted discretion in deciding whether to impose a "special events" fee at all. And, once the Commissioner has decided to impose a "special events" fee, the regulations allow the Commissioner uncontrolled discretion in deciding the amount of the fee, limited only by the prescribed maximums. It is true, the ordinance prescribes a list of "factors" to be considered, but it assigns no weight to any of the factors. And, especially in view of the fact that the 11th prescribed factor is "such other information as the Commissioner shall deem relevant," the statutory scheme effectively gives the Commissioner absolute, unregulated discretion as to the amount of the fee for any reason she deems pertinent, within the prescribed maximum limits. The Commissioner may impose a fee as high as $100,000 and as low as one dollar (or zero dollars) on a public Central Park event that enjoys commercial sponsorship, and any fee between $25,000 and zero for an identical event without commercial sponsorship. The pre-April 2001 guidelines gave the Commissioner even greater discretion in determining fees for special events held in City parks. Neither the guidelines nor § 2–10 requires the Commissioner to explain the reasoning that justified the fee or to charge similar fees to similar events. The City was unable to explain how it set fees ranging from $1,000 to $10,000 for particular events.

Regulations granting such broad and unchecked discretion to a government official charged with imposing fees on traditional expressive activities cannot overcome the "heavy presumption" of invalidity to which prior restraints on speech are subject.

 The City contends that, because TA receives commercial support for its event and displays the logos of sponsors in some of its promotional literature, the Century Bike Tour involves "commercial speech," and hence receives less robust First Amendment protection than purely political speech. This is no answer. The commercial elements of the Bike Tour are relatively trivial. By far the main thrust of the event is a political demonstration by thousands of people advocating in favor of bicycle-friendly regulation by the City. Notwithstanding the presence of minor commercial elements, such as display of corporate logos, this speech was a far distance from commercial speech undertaken to solicit a commercial transaction. See *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). See also *Hays County Guard-*

*ian v. Supple,* 969 F.2d 111, 120 (5th Cir. 1992) (rejecting claim that the presence of advertisements in a newspaper rendered its expression commercial speech); *Ad World, Inc. v. Township of Doylestown,* 672 F.2d 1136, 1139 (3d Cir.1982) ("The fact that a publication carries advertisements ... does not render its speech commercial for first amendment purposes."). Even assuming the City would have been free to employ its discretionary regulatory scheme for such commercial events, such a scheme was not permissible as to the Bike Tour.

**B. Other Distinctions**

Because the City's regulatory scheme is invalidated by the overbroad discretion it confers on the Parks Commissioner, we need not rule on whether the scheme's various distinctions, indicated by the City as relevant in fee determinations, are consistent with the First Amendment. Some clearly are; others are more problematic. In confining our holding to the constitutional infirmity of overbroad discretion, we expressly do not wish to be read as approving any individual distinction the City has deemed desirable. Should the City, in response to this opinion, wish to promulgate an amended set of regulations governing special events fees, it should give particular attention to pertinent rulings of the United States Supreme Court when defining variables that increase or decrease permissible fees.[2]

**CONCLUSION**

The judgment of the district court declaring § 2–10, and the predecessor guidelines for determining fees, unconstitutional when applied to events involving the exercise of rights protected by the First Amendment, enjoining the City from enforcing it against plaintiff, and awarding damages of $17,500 is affirmed.

---

2. See, e.g., *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 784–5, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ("[Speech] otherwise ... within the protection of the First Amendment [does not lose] that protection simply because its source is a corporation .... In the realm of protected speech, the legislature is constitutionally disqualified from dictating ... the speakers who may address a public issue.") (citing *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)).