**SOUTHERN OREGON BARTER FAIR, Plaintiff–Appellant,**

v.

**JACKSON COUNTY, OREGON; Jackson County Board of Commissioners; Jackson County Sheriff's Department; Ric Holt; Jack Walker; Sue Kupillas; Robert Kennedy, Defendants,**

and

**State of Oregon, Defendant–Intervenor–Appellee.**

No. 02–35560.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2003.

Filed June 24, 2004.

Brian Michaels, Eugene, OR, for the plaintiff-appellant.

Christina Hutchins, Assistant Attorney General, Kelly Knivila, Assistant Attorney General, Salem, OR, for the defendant-intervenor-appellee.

Before: ALARCÓN, RAWLINSON, and BYBEE, Circuit Judges.

## OPINION

BYBEE, Circuit Judge:

The Southern Oregon Barter Fair is a nonprofit corporation that held an annual fair in Oregon between 1978 and 1996. The Fair describes its event as a religious gathering, a "harvest celebration and gathering of ... 'new age,' 'back-to-the-land' hippies and friends," and a "counterculture crafts fair" where artisans and vendors set up booths for people to buy crafts. In

order to hold several previous events, most recently the 1996 event, the Fair had to obtain a permit from Jackson County, Oregon, under the Oregon Mass Gathering Act, OR. REV. STAT. §§ 433.735–.770, 433.990(6) (2001). This appeal presents the question whether, as the Fair contends, the Act is facially unconstitutional under the First Amendment.

Oregon's Mass Gathering Act is similar to mass gathering statutes found in various other states. The Oregon Legislative Assembly passed the Act in 1971, finding "that the uncontrolled outdoor gatherings of large groups of persons for extended periods of time have necessitated a need for the establishment of reasonable health and safety rules to regulate such outdoor mass gatherings." Id. § 433.740. The Act regulates any "outdoor mass gathering," defined as a gathering of more than 3,000 persons in an open space for more than 24 hours but fewer than 120 hours.[1] The Act prohibits such gatherings "on real property the organizer[2] owns, leases or possesses" unless the county governing body for the location where the gathering is planned (here, the Jackson County Board of Commissioners) has issued a permit. Id. § 433.745(2).[3]

The organizer must submit to the governing body a permit application contain-ing the applicant's name and address, a legal description of the place, the date, the estimated attendance, and the nature of the proposed gathering, as well as "[s]uch other appropriate information as the county governing body may require in order to insure compliance with rules of the Department of Human Services." Id. § 433.750(1). The governing body "shall issue a permit ... when the organizer demonstrates compliance with or the ability to comply with the health and safety rules governing outdoor mass gatherings to be regulated according to the anticipated crowd and adopted by the Department of Human Services." Id. § 433.750(1).[4] The Act authorizes the Department of Human Services to promulgate rules with respect to various health and safety issues at mass gatherings, including adequate water supply, drainage and sewage facilities, toilet facilities, refuse storage and disposal facilities, food, sanitary food service, emergency medical facilities, fire protection, security personnel and traffic control. Id. § 433.760. The Health Division of the Oregon Department of Human Services has accordingly promulgated regulations prescribing detailed requirements for each of the above specific health and safety issues. OR. ADMIN. R. 333–039–0005 to 333–039–0055.

---

1. The full definition is:
 "Outdoor mass gathering," unless otherwise defined by county ordinance, means an actual or reasonably anticipated assembly of more than 3,000 persons which continues or can reasonably be expected to continue for more than 24 consecutive hours but less than 120 hours within any three-month period and which is held primarily in open spaces and not in any permanent structure.
 OR. REV. STAT. § 433.735(1).

2. "Organizer" is defined to include "any person who holds, stages or sponsors an outdoor mass gathering and the owner, lessee or possessor of the real property upon which the outdoor mass gathering is to take place." OR. REV. STAT. § 433.735(2).

3. In full, "No organizer shall hold, conduct, advertise or otherwise promote an outdoor mass gathering or allow an outdoor mass gathering to be held on real property the organizer owns, leases or possesses unless a permit to hold such outdoor mass gathering has been issued by the county governing body in which the outdoor mass gathering is to take place." OR. REV. STAT. § 433.745(1).

4. Gatherings of more than 120 hours are subject to additional requirements geared to ensure compatibility with existing land uses. OR. REV. STAT. § 433.763.

The Act contemplates input from local law enforcement and health and safety officials in the application process. It requires the county governing body to send notice of an application to the county sheriff, the county health officer, and the chief of the relevant fire district. OR. REV. STAT. § 433.750(2). The county governing body must also hold a public hearing on the proposed gathering's compliance with the Act, and must publish notice of the hearing in specified places at least 10 days before the hearing. *Id.* § 433.750(4). Each county officer (police, health, and fire) who has received notice of the application may submit written comments and recommendations to the county governing body no later than the date of the hearing. *Id.* § 433.750(3). Furthermore, in reviewing an application, the county governing body "may require such plans, specifications and reports as it may deem necessary for proper review and it may request and shall receive from all public officers, departments and agencies of the state and its political subdivisions such cooperation and assistance as it may deem necessary." *Id.* § 433.755(1).

Additionally, the Act allows the county to charge an application fee and require the applicant to obtain insurance in appropriate circumstances. Specifically, the Act provides that a county governing body "may charge permit applicants a fee reasonably calculated to reimburse the county for its reasonable and necessary costs in receiving, processing and reviewing applications for permits to hold outdoor mass gatherings." *Id.* § 433.750(6). The Act limits the amount of the fee as follows: "a fee authorized by this subsection shall not exceed $5,000 and shall not be charged when the governing body finds, by a preponderance of the evidence presented to the governing body, that the applicant is unable to reimburse the governing body." *Id.*[5] As for insurance, the county governing body may, if it determines that the proposed gathering "creates a potential for injury to persons or property, . . . require organizers to obtain an insurance policy in an amount commensurate with the risk, but not exceeding $1 million." *Id.* § 433.755(1). The policy "shall provide coverage against liability for death, injury or disability of any human or for damage to property arising out of the outdoor mass gathering" and shall name the county as an additional insured. *Id.*

Finally, "[a]ny decision of a county governing body on an application for a permit to hold an outdoor mass gathering may be appealed to a circuit court for the county" under procedures specified elsewhere. *Id.* § 433.750(5).

In accordance with the Act, the Fair applied to the Jackson County Board of Commissioners for, and received, permits for its 1994 and 1995 events. The 1996 application process, however, was tumultuous. The Fair applied for a permit, but received one only after a delay of several months; and even then, the permit contained numerous conditions that the Fair considered unreasonable, including a required security deposit of nearly $18,000 (consisting of over $3,600 for administrative expenses in relation to the application, over $11,700 for the cost to the county sheriff of providing neighborhood security, and other county expenses).

Accordingly, before the 1996 event took place, the Fair brought suit in federal dis-

---

**5.** The Oregon Court of Appeals has held that § 433.750(6) simply authorizes a county governing body to charge a fee for the services described in that statute; it does not preclude the governing body from charging, as author-ized by local ordinance or regulation, other fees for services provided to a mass gathering. *Fence v. Jackson County,* 135 Or.App. 574, 900 P.2d 524, 527 (1995).

trict court in Oregon against Jackson County, the Jackson County Board of Commissioners, and the Jackson County Sheriff. Among other things, the complaint alleged that the Act on its face violated the First Amendment, and sought injunctive and declaratory relief against enforcement of the Act. The district court[6] granted a preliminary injunction against some of the permit conditions, including the fee.

The State of Oregon intervened and moved for summary judgment on the claims challenging the facial constitutionality of the Act. In a careful opinion, the district court granted the state's motion and dismissed the Fair's facial challenge, holding that the Act is a proper content-neutral time, place, and manner regulation. The court certified the relevant claims for appeal under FED. R. CIV. P. 54(b). Thus, only the facial challenge is before us. We are not concerned here with the Fair's remaining claims, which included as-applied challenges to the county commissioners' and sheriff's allegedly discriminatory enforcement of the Act against the Fair.[7]

## I

■■■ At the outset, we must determine whether the case is moot. The state argued to the district court that the Fair has not applied for a mass gathering permit, or engaged in any other preparations for a mass gathering, since 1996, and that the case was therefore moot. The district court rejected this contention, but the state raises it again on appeal.[8] Mootness is a question of law reviewed de novo. *See Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1116 (9th Cir.2003).

■■■ To avoid mootness, the court must determine that the issues in a case remain live and that the parties continue to have a legally cognizable interest in the outcome throughout the proceeding. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 797–98 (9th Cir.1999); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 48, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). "The underlying concern is that, when the challenged conduct ceases such that there is no reasonable

---

6. The parties consented to a magistrate judge's conduct of all proceedings in the case. 28 U.S.C. § 636(c)(1); FED. R. CIV. P. 73(a), (b). The parties further consented that any appeal from a final judgment by the magistrate judge would proceed directly to this court. 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

7. Specifically, the Fair asserted, under 42 U.S.C. § 1983, that the county commissioners and the sheriff violated the First Amendment by requiring unlawful sums of money from the Fair, failing to act on the permit application in a timely fashion, denying the Fair adequate time for judicial review of the decision on the application, subjecting the permit to unlawful conditions, and attacking the event with a disproportionate and unnecessary number of law enforcement officers. Again, those claims remained before the district court and are not before us. According to counsel for the state at oral argument, the

claims were tried to a jury, the jury gave a verdict for the Fair, and the claims were subsequently settled.

8. The Fair contends in its reply brief that the state may not raise either mootness or the appropriateness of the facial challenge (an issue discussed below) without having filed a cross-appeal. That is incorrect. A prevailing party need not cross-appeal to defend a judgment on any ground properly raised below, as long as it seeks to preserve rather than to change the judgment. *Rivero v. City & County of San Francisco*, 316 F.3d 857, 862 (9th Cir.2002). Additionally, as to the mootness issue, mootness goes to the court's power to hear the case, and therefore may be raised at any time by the parties, or even sua sponte by the court under its independent obligation to ensure that it has authority under Article III. *See, e.g., Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir.1999).

expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *City of Erie*, 529 U.S. at 287, 120 S.Ct. 1382 (citations, internal quotation marks, and alterations omitted). The party asserting mootness bears the burden of establishing that there is no effective relief remaining that the court could provide. *Oregon Advocacy Ctr.*, 322 F.3d at 1116–17.

This proceeding would be moot if the Fair had entirely ceased to operate, left the business, and no longer sought or intended to seek a license. *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001). In *City News*, the Court dismissed the case as moot because it was undisputed that the adult-oriented shop at issue "ha[d] ceased to operate as an adult business and no longer [sought] to renew its license"; the shop neither pursued nor "currently expresse[d] an intent to pursue a license." *Id.*

██ We conclude that the Fair, unlike the business in *City News*, has a sufficient ongoing interest in the outcome of the case to preclude mootness. There is no contention that the Fair has ceased to exist as a corporate entity, or that it no longer seeks to hold another gathering. The state rescinded the Fair's corporate status in 1998, apparently because the Fair failed to pay an administrative fee, but the Fair successfully requested reinstatement. The Fair has not actually held a major event since 1996, because it lacks funding and an appropriate site. However, it held a smaller event in 1997 in an attempt to raise funds, and since then has continued to seek a site for a full-sized event through discussions with the County and with private landowners. So far as the record reflects, these discussions have not yet yielded an appropriate site.

The state contends that the possibility that the Fair will actually obtain funding and a site is speculative. On this record, however, we cannot conclude that the barriers to the Fair's staging another event are "insurmountable" and therefore enough to moot the case. *Clark v. City of Lakewood*, 259 F.3d 996, 1012 (9th Cir. 2001). Here, as in *Clark*, the Fair's "stated intention to return to business if the[statute] is declared unconstitutional," together with the ongoing efforts the Fair has made to arrange another gathering, sufficiently distinguish it from the plaintiff in *City News*. *Clark*, 259 F.3d at 1011–12 & n. 9. We cannot say that there is no reasonable expectation that the state will enforce the Act against the Fair again. We therefore proceed to review the district court's grant of summary judgment, a decision we review de novo. *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1029 (9th Cir.2004).

## II

██ We conclude, contrary to the State's suggestion, that the Fair may bring a facial challenge to the Act. Whether the Act is subject to facial attack is a question of law reviewed de novo. *See Roulette v. City of Seattle*, 97 F.3d 300, 302 (9th Cir. 1996). Courts generally disfavor facial challenges to legislation, although this reluctance is somewhat relaxed in the First Amendment context. *See, e.g., Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); *Roulette*, 97 F.3d at 303; *IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1189–91 (9th Cir.1988). In the particular case of a licensing scheme that restrains First Amendment rights, there are two primary reasons to hear a facial challenge. First, there is the danger of chilling constitutionally protected speech, because speakers may self-censor rather than seek a license or risk prosecution by speaking. *City of*

*Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–62, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Second, when a law lacks express standards against which courts can measure the licensor's actions, as-applied challenges may be insufficient protection against content-based censorship. *Id.* These two risks, however, diminish as the conduct targeted by the law moves along the spectrum from activity that is clearly protected by the First Amendment to activity with some expressive purpose to activity with no expressive purpose. "[L]aws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship." *Id.* at 760–61, 108 S.Ct. 2138; *cf. Broadrick v. Oklahoma*, 413 U.S. 601, 614–16, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

■ Accordingly, to be subject to facial challenge, a licensing law "must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of the risks of censorship. *Lakewood*, 486 U.S. at 759, 108 S.Ct. 2138. "[L]aws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken," such as laws requiring building permits, pose little danger of censorship and may therefore be challenged only by the usual as-applied method. *Id.* at 760–61, 108 S.Ct. 2138. In other words, a facial challenge is proper only if the statute by its terms seeks to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling, *Roulette*, 97 F.3d at 303; *see also United States v. Kalb*, 234 F.3d 827, 834–35 (3d Cir.2000), or if the statute significantly restricts opportunities for expression, *see*

*Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 950 (9th Cir.1997).

■ The Oregon Mass Gathering Act regulates gatherings of large numbers of people overnight in open spaces. The fact that the Act regulates gatherings does not automatically mean that the Act implicates the First Amendment freedoms of speech or assembly. The First Amendment protects "expressive association"— that is, association for the purpose of "speech, assembly, petition for the redress of grievances, and the exercise of religion"—but there is no "generalized right of social association" protecting "chance encounters in dance halls" and the like. *Conti v. City of Fremont*, 919 F.2d 1385, 1388–89 (9th Cir.1990) (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989)) (internal quotation marks omitted); *see also IDK*, 836 F.2d at 1191–96; *United States v. Masel*, 54 F.Supp.2d 903, 913 (W.D.Wis. 1999). It is certainly possible to imagine gatherings that might be subject to the Act but are purely recreational and devoid of expressive purpose, such as some carnivals, festivals, and exhibitions. In fact, in this case, it is not crystal clear whether the purposes of the Fair are expressive. Nonetheless, the statute is broad enough to cover gatherings that are expressive, such as large-scale demonstrations or religious ceremonies. *Cf. Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (assuming without deciding, while discussing an as-applied challenge, that "overnight sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment").

Moreover, the Supreme Court, this court, and others have entertained the merits of facial challenges to similar statutes and regulations. *Thomas v. Chicago*

*Park Dist.,* 534 U.S. 316, 320–25, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002); *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 133, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *United States v. Linick,* 195 F.3d 538, 541–42 (9th Cir.1999); *Thomas v. Chicago Park Dist.,* 227 F.3d 921, 924–25 (7th Cir.2000); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1309 (11th Cir. 2000). *But see Kalb,* 234 F.3d at 834–35. While it is possible that the appropriateness of the facial attacks at issue was never raised in those cases, we think it equally possible that the facial attacks were allowed because mass gatherings bear a sufficient nexus to conduct commonly associated with expression. The gathering of a large number of people to show support for a cause undeniably attracts public attention and can be an extremely effective way of promoting the group's message. We conclude that the Act bears a sufficiently close nexus to conduct commonly associated with expression that it is subject to a facial challenge.

### III

 The Fair argues that, because the district court issued a preliminary injunction against enforcement of some of the terms of the permit, the court was bound by the law of the case doctrine to grant summary judgment in the Fair's favor. The law of the case doctrine ordinarily precludes a court from reexamining an issue previously decided by the same court or a higher court in the same case. *Old Person v. Brown,* 312 F.3d 1036, 1039 (9th Cir.2002). We review the district court's decision whether to apply the doctrine for abuse of discretion. *United States v. Lummi Indian Tribe,* 235 F.3d 443, 452 (9th Cir.2000).

 Decisions on preliminary injunctions require the district court to assess the plaintiff's likelihood of success on the merits, not whether the plaintiff has actually succeeded on the merits. *See City of Anaheim v. Kleppe,* 590 F.2d 285, 289–90 (9th Cir.1978); *Beal v. Stern,* 184 F.3d 117, 129–30 (2d Cir.1999). Additionally, decisions on preliminary injunctions are just that—preliminary—and must often be made hastily and on less than a full record. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Thus, even though the facial challenge presented to the district court here involved primarily issues of law, we see no reason why the court should have deviated from the general rule that decisions on preliminary injunctions "are not binding at trial on the merits," *id.,* and do not constitute the law of the case, *Golden State Transit Corp. v. City of Los Angeles,* 754 F.2d 830, 832 n. 3 (9th Cir. 1985), *rev'd on other grounds,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986).

 In addition, even if the law of the case doctrine did apply, a court properly exercises its discretion to reconsider an issue previously decided if there has been an intervening change in the law. *Thomas v. Bible,* 983 F.2d 152, 155 (9th Cir.1993). Here, the Supreme Court rendered its decision in *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783, after the district court issued the preliminary injunction. As explained below, the *Thomas* decision provided important guidance in this case. Therefore, the court clearly did not abuse its discretion in reexamining the merits of the facial challenge. We now proceed to the merits.

### IV

The Fair argues that the Act is constitutionally defective on its face because it confers unbridled discretion on the County in the permitting process, enabling the County to disfavor applicants with whose message the County disagrees. The facial

challenge rests on three particular arguments: (1) the Act lacks a deadline for the local governing body to act on permit applications, (2) the Act lacks a provision for prompt judicial review of permit application denials, and (3) the Act gives the governing body unconstrained discretion to set the amount of the permit application fee. The first two arguments are related; we will discuss them together, followed by the third.

### A

As the Fair argues, the Act contains no time limit within which the County must issue a decision on a permit application. As for judicial review, the Act does provide that any decision of a county governing body on a permit application may be appealed to a circuit court for the county, *see* OR. REV. STAT. § 433.750(5); but the Fair contends that there is no assurance that such review will be prompt. In essence, then, the Fair's argument over judicial review, like its claim about processing permit applications, is an argument that the Act is constitutionally flawed without time limits.

In *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Supreme Court held that a content-based film licensing process must contain three procedural safeguards (including the two the Fair contends are required here), or else be classified as an unconstitutional prior restraint: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion) (citing *Freedman,* 380 U.S. at 58–60, 85 S.Ct. 734). In *FW/PBS,* the Court applied the first two of these safeguards—the ones the Fair argues apply here—to a licensing scheme that, like the *Freedman* scheme, was content-based (in that it targeted businesses dealing in sexually explicit speech). *See Thomas,* 534 U.S. at 322 n. 2, 122 S.Ct. 775; *see also Riley v. Nat'l Fed'n of the Blind,* 487 U.S. 781, 801–02, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). This court has applied the same two *Freedman* safeguards to a licensing scheme specifically targeting adult bookstores. *See Baby Tam & Co., Inc. v. City of Las Vegas,* 199 F.3d 1111, 1114–15 (9th Cir.2000); *Baby Tam & Co., Inc. v. City of Las Vegas,* 154 F.3d 1097, 1100–01 (9th Cir.1998).

In *Thomas v. Chicago Park Dist.,* however, the Supreme Court clarified that none of the *Freedman* safeguards are required of content-neutral time, place, and manner permit schemes. 534 U.S. at 320–23, 122 S.Ct. 775. Here, the Oregon Mass Gathering Act is clearly a content-neutral time, place, and manner regulation. The Act applies to all mass gatherings irrespective of the purpose for the gathering. Unlike the statutes at issue in *Freedman* and the *Baby Tam* decisions, the Act does not single out any particular activity or speech for regulation. It authorizes the Department of Human Services to promulgate regulations with respect to water supply, fire protection, and similar health and safety issues attendant on overnight gatherings of large crowds. OR. REV. STAT. § 433.760. None of these health and safety issues has anything to do with censoring the content of the applicant's speech. *See, e.g., Thomas,* 534 U.S. at 322, 122 S.Ct. 775; *United States v. Griefen,* 200 F.3d 1256, 1260 (9th Cir.2000); *United States v. Baugh,* 187 F.3d 1037, 1043 (9th Cir.1999). Additionally, once the applicant demonstrates compliance with the regulations, the governing body has absolutely no discretion to withhold the permit: the gov-

erning body *"shall* issue a permit upon application when the organizer demonstrates compliance with or the ability to comply with the health and safety rules...." OR. REV. STAT. § 433.750(1) (emphasis added). Nothing in the Act purports to regulate gatherings on the basis of their subject matter or the organizers' or attendees' viewpoint. On its face, the Act is content-neutral.

 Because it is content-neutral, the Act need not contain the procedural safeguards required of content-based regulations. The Act need not include either a deadline for consideration by the governing body or a provision for prompt judicial review. *See Thomas,* 534 U.S. at 322–23, 122 S.Ct. 775. It is well-settled, of course, that even content-neutral time, place, and manner regulations may not confer unbridled discretion on the licensing authority, so as to stifle free expression. *Id.* at 323, 122 S.Ct. 775; *Forsyth,* 505 U.S. at 130–33, 112 S.Ct. 2395; *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana,* 379 U.S. 536, 554–58, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Am. Civil Liberties Union of Nevada v. City of Las Vegas,* 333 F.3d 1092, 1106–08 (9th Cir.2003). Time, place, and manner restrictions must "contain adequate standards to guide the official's discretion and render it subject to effective judicial review." *Thomas,* 534 U.S. at 323, 122 S.Ct. 775 (citation omitted). In other words, the regulation must provide objective standards that remove the permitting decision from the whim of the official; the absence of such standards enables the official to favor some speakers and suppress others. *See Forsyth,* 505 U.S. at 133, 112 S.Ct. 2395. The question then becomes, even though the Act is not categorically required to contain the *Freedman* safeguards, does the failure to provide them confer unbridled discretion on the County?

We acknowledge the theoretical possibility that, without a deadline, Jackson County could effectively shut down gatherings by delaying permit decisions indefinitely. *See Grossman v. City of Portland,* 33 F.3d 1200, 1206 (9th Cir.1994); *Bo Fancy Prods., Inc. v. Rabun County Bd. of Comm'rs,* 267 Ga. 341, 478 S.E.2d 373, 375–77 (1996). The uncertainty of knowing when, if ever, the local governing body will act on the permit application may hamstring the arrangements for such large events, which must be made far in advance. In fact, in this case, the uncertainty inherent in the 1996 application process was one of the Fair's primary reasons for bringing suit.

In discussing why the content-neutral ordinance in *Thomas* adequately limited the discretion of the decision-maker, the Court observed that the ordinance required the municipality to process applications within 28 days. 534 U.S. at 324, 122 S.Ct. 775. But the Court did not indicate that the deadline was an essential component of a reasonable time, place, and manner regulation. To read the opinion that way would flatly contradict the decision's clear holding that time, place, and manner regulations need not contain the *Freedman* safeguards. *Thomas,* 534 U.S. at 322–23, 122 S.Ct. 775. Despite the Court's reference to the 28–day deadline, therefore, we conclude that the procedural safeguards doctrine is relevant only to explicit censorship schemes, not to content-neutral schemes. *Granite State Outdoor Advertising, Inc. v. City of St. Petersburg,* 348 F.3d 1278, 1281–83 (11th Cir.2003) (absence of time limits for municipality to process permit applications does not render content-neutral sign ordinance unconstitutional); *Griffin v. Sec'y of Veterans Affairs,* 288 F.3d 1309, 1328 (Fed.Cir.2002) (procedural safeguards requirement limited to "explicit censorship scheme[s]" that "by definition [are] not content-neutral").

Here, the overnight mass gatherings the state seeks to regulate raise special health and safety issues because of their size and duration. The state has an eminently valid interest in ensuring the health and safety of its residents and visitors at such large, lengthy events. *Cf. Grossman,* 33 F.3d at 1206 (noting, in discussing a permit requirement for demonstrations in public parks, the greater burden that larger groups place on park facilities). Just as the complexity of these events requires applicants for mass gathering permits to prepare well in advance, the local governing bodies responsible need time to evaluate applications and conduct inspections, making a strict deadline for permit action impracticable. The lack of a permit application deadline is not sufficient to invalidate the Act on a facial challenge. *Cf. Outdoor Sys., Inc. v. City of Mesa,* 997 F.2d 604, 613 (9th Cir.1993) (holding municipal sign codes constitutional even though the codes lacked a time limit for processing applications). Should abuse occur, it may be remedied adequately through as-applied challenges like the Fair's § 1983 claim (which is not before us on appeal). *See Thomas,* 534 U.S. at 325, 122 S.Ct. 775; *Granite State,* 348 F.3d at 1282.

### B

The Fair's remaining contention is that the Act confers excessive discretion on the governing body to set permit application fees. As noted above, a time, place, and manner restriction must "contain adequate standards to guide the official's discretion and render it subject to effective judicial review." *Thomas,* 534 U.S. at 323, 122 S.Ct. 775 (citation omitted). With regard to fees in particular, there is nothing unconstitutional in a municipality's charging a fee to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire,* 312 U.S.

569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (internal quotation marks omitted); *see also Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 116, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). A state may, in other words, impose a permit fee that is reasonably related to legitimate content-neutral considerations, such as the cost of administering the ordinance, the cost of public services for an event of a particular size, or the cost of special facilities required for the event. *See Church of the Am. Knights of the Ku Klux Klan v. City of Gary,* 334 F.3d 676, 682 (7th Cir.2003); *Marijuana Prohibition,* 219 F.3d at 1320–24 & n. 16; *Northeast Ohio Coalition for the Homeless v. City of Cleveland,* 105 F.3d 1107, 1109–10 (6th Cir.1997); *cf. Baldwin v. Redwood City,* 540 F.2d 1360, 1372 & nn. 32–33 (9th Cir.1976).

This principle is subject to an important limitation: the regulation must provide objective standards that do not leave the amount of the fee to the whim of the official, enabling the official to favor some speakers and suppress others. *Forsyth,* 505 U.S. at 130–33, 112 S.Ct. 2395. The ordinance in *Forsyth* required that every permit applicant "shall pay in advance ... a sum not more than $1,000 for each day" of a parade, procession, or open air public meeting, and stated that the administrator "shall adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." *Id.* at 126–27, 131 n. 9, 112 S.Ct. 2395. The administrator testified that in that particular case he had chosen not to include the cost of his clerical support and staff in the fee, and that he had deliberately undervalued the cost of his time spent processing the application. *Id.* at 132, 112 S.Ct. 2395. He also testified that he had in fact charged other groups significantly lower fees, or no fee at all. *Id.* Based on this uneven implementation, the

Court struck down the ordinance, because "[t]he decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator." *Id.* at 133.

Here, as noted above, the Act provides that a county governing body "may charge permit applicants a fee reasonably calculated to reimburse the county for its reasonable and necessary costs in receiving, processing and reviewing applications for permits to hold outdoor mass gatherings." OR. REV. STAT. § 433.750(6). The fee "shall not exceed $5,000 and shall not be charged when the governing body finds, by a preponderance of the evidence presented to the governing body, that the applicant is unable to reimburse the governing body." *Id.* The Fair argues that, because the statute states that the governing body "may" charge the fee, rather than "shall" or "must" charge the fee, the provision allows the governing body to charge or not to charge at its whim, in violation of *Forsyth.*

We reject this argument for two reasons. First, unlike in *Forsyth,* we lack actual evidence of a pattern of abuse. Second, the Supreme Court rejected a similar argument in *Thomas,* which followed *Forsyth.* In *Thomas,* the petitioners argued that the use of the word "may" in the provision at issue allowed the permitting authority to waive the permit requirements for favored speakers, but not for others. 534 U.S. at 324, 122 S.Ct. 775. In response, the Court stated that "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Id.* at 325, 122 S.Ct. 775. We reject the Fair's argu-

ment on the same basis. We have no evidence of a pattern of abuse like that presented in *Forsyth* or referenced in *Thomas.*

As for the decision how much to charge, the provision does leave some discretion over the amount of the fee to the governing body, but the discretion is not so broad that the statute fails the test of *Thomas* and *Forsyth.* In *Forsyth,* the ordinance, in authorizing the administrator to "adjust the amount to be paid [between zero and $1,000] in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed," 505 U.S. at 127, 112 S.Ct. 2395 (quoting the ordinance), completely lacked any standard cabining the administrator's discretion, *id.* at 132–33, 112 S.Ct. 2395. Here, the Act does contain a standard: the fee must be "reasonably calculated" based on the county's "reasonable and *necessary* costs" in processing applications, § 433.750(6) (emphasis added), and in any event may not exceed $5,000 and shall not be charged when the applicant cannot pay, *id.* These limits objectively constrain the governing body's discretion and allow effective judicial review. *Cf. Transp. Alternatives, Inc. v. City of New York,* 340 F.3d 72, 78 (2d Cir.2003) (striking down regulation affording unrestricted discretion whether to impose a fee at all, as well as unrestricted discretion as to the fee amount). Other systems might constrain the county's discretion more narrowly—perhaps, for instance, a content-neutral sliding scale of fees, *see Marijuana Prohibition,* 219 F.3d at 1320–24 & n. 16; *MacDonald v. Chicago Park Dist.,* 132 F.3d 355, 362–63 (7th Cir.1997), a lower maximum fee, or some requirement that the County provide the applicant with an explanation of the expenses charged. However, we see no reason why that level of

specificity is absolutely required under the "unbridled discretion" theory.

Finally, the statutory standard leaves no possibility of a heckler's veto. That is, the standard does not allow the governing body to gauge the reaction the applicant's message will generate and set the fee according to the projected costs of policing hostile listeners, a feature the Supreme Court disapproved in *Forsyth* as impermissibly content-based. 505 U.S. at 134, 112 S.Ct. 2395; *see also Church of the Am. Knights,* 334 F.3d at 680–82; *MacDonald v. City of Chicago,* 243 F.3d 1021, 1032–34 (7th Cir.2001). There is always a risk that, in a given case, the county commissioners might abuse their power under the Act; but the Fair or any other applicant is free to contend in an as-applied challenge that the commissioners have applied the fee provision unlawfully. Indeed, the Fair has challenged the fee charged in 1996 in its § 1983 claim against the commissioners and the sheriff (a claim that is not before us). We do not have to preterm it reasonable health and safety regulations on the chance that a public official might abuse his discretion and trample on First Amendment rights. On its face the provision is constitutional.

In sum, we uphold the challenged provisions of the Act as consistent with the First Amendment.

**AFFIRMED.**