# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SEATTLE AFFILIATE OF THE OCTOBER
22ND COALITION TO STOP POLICE
BRUTALITY, REPRESSION AND THE
CRIMINALIZATION OF A GENERATION,
an unincorporated association,
              *Plaintiff-Appellant,*

              v.

CITY OF SEATTLE; R. GIL
KERLIKOWSKE, Chief of Seattle
Police Department; SERGEANT DOE,
a Seattle Police Sergeant;
LIEUTENANT DOE, a Seattle Police
Lieutenant; OFFICER DOE, a Seattle
Police Officer; ERIC SANO; STEVEN
PAULSEN,
              *Defendants-Appellees.*

No. 06-35597

D.C. No.
CV-04-00860-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
February 5, 2008—Seattle, Washington

Filed December 12, 2008

Before: Raymond C. Fisher, Ronald M. Gould and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Ikuta

16369

**COUNSEL**

Michael K. Ryan (argued), Ryan Drew Redekopp and Alex Wagner, Preston Gates & Ellis LLP, Seattle, Washington, and Aaron H. Caplan, American Civil Liberties Union of Washington, Seattle, Washington, for the plaintiff-appellant.

Carlton W. M. Seu (argued), Assistant City Attorney, and Thomas A. Carr, City Attorney, Seattle, Washington, for the defendants-appellees.

---

**OPINION**

FISHER, Circuit Judge:

We are presented with a conflict between those who wish to conduct a parade on Seattle's city streets — a forum historically preferred by people who want to demonstrate their messages of honor, celebration or, as in this case, protest — and the city's interests in traffic safety. The City of Seattle by ordinance gives its police chief, when issuing a parade permit, the discretion to require marchers to use the sidewalks instead of the city streets. The issue is whether the ordinance violates the free speech guarantees of the First Amendment because on its face it impermissibly grants "the licensing official . . . unduly broad discretion." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002). We conclude that the ordinance by its terms gives the Chief of Police unbridled discretion to force marchers off the streets and onto the sidewalks, unchecked by any requirement to explain the reasons for doing so or to provide some forum for appealing the chief's decision. We therefore hold that the parade ordinance is facially unconstitutional.

## I. Factual and Procedural Background

The Seattle affiliate of the October 22nd Coalition to Stop Police Brutality, Repression and the Criminalization of a Gen-

eration ("Coalition") is an unincorporated association dedicated to raising awareness of the problem of police brutality. It is part of a national coalition with 40 affiliates in cities throughout the United States; the focus of these affiliates' efforts is holding a coordinated annual day of protest on October 22. Every year since 1996, the Coalition's Seattle members have held parades, rallies and speeches on this day in order to publicly commemorate their "National Day of Protest to Stop Police Brutality." The Coalition intends to continue holding these events annually in the future.

The City of Seattle requires anyone wishing to conduct a parade in Seattle to first obtain a permit from the Seattle Chief of Police. The relevant ordinance states:

> No person shall conduct or participate in a parade upon any street or alley in the City without first submitting a written notification to the Chief of Police and obtaining a permit from the Chief of Police to do so. Upon written notification to the Chief of Police, the Chief of Police shall grant a permit. So that preparations for traffic regulation can be made, the written notification for permit shall state the place and hour of formation, the proposed line of movement or march, the scheduled starting time, and the names of the persons having charge or control . . . . The Chief of Police may modify the place and hour of formation, the proposed line of movement or march, and the scheduled starting time in the interest of vehicular or pedestrian traffic safety.

Seattle Mun. Code Ord. 11.25.020 (hereinafter "Parade Ordinance").[1] Another Seattle ordinance defines a "parade" as "any organized movement or march of persons and/or things which requires the closure of streets to prevent a conflict with the regular flow of vehicular traffic." SMC 11.14.410. A

---

[1]Hereinafter, all citations to "SMC" refer to the Seattle Municipal Code.

group wishing to hold a parade must apply for a permit at least 48 hours in advance. *See* SMC 11.25.020.

The Coalition has applied for and received a parade permit from the Seattle Chief of Police every year since 2001. Over the course of several years, however, these permits have been subjected to conditions that the Coalition found objectionable. In both 2002 and 2004, the Seattle Chief of Police issued parade permits requiring the Coalition's marchers to "use the sidewalk and obey traffic control signals" if there were fewer than 200 marchers present.[2] The Coalition's 2003 parade permit did not contain any minimum numbers requirement, but on the day of the march, Seattle police officers instructed the Coalition to use the sidewalks. Coalition members protested that the permit gave them the right to march on the streets, but one of the police officers present told group members that the parade permit had been "rescinded" and that the decision to rescind was "based on the number" of marchers, which was estimated to be between 80 and 100. Under protest, the Coalition's 2003 parade proceeded on the sidewalk along the designated route, with police escorting the marchers on foot and bicycle.

Seattle does not include a minimum numbers requirement in all — or even most — parade permits as a condition of allowing marchers to utilize the streets, nor does it set the minimum requirement at a consistent number when it does impose one. Seattle issued 279 parade permits between January 1999 and July 2005, of which 25, or approximately nine percent, imposed some form of a minimum numbers requirement as a prerequisite to marching in the street. Twenty-one of these permits required a minimum of 200 participants, while the remaining set limits that varied between 50 and 500 participants. The Coalition maintains that Seattle's permitting practices reveal that political or protest marches were more

---

[2]Seattle ultimately agreed to reduce this minimum numbers requirement in the 2004 permit to 100, after negotiations with the Coalition's attorney.

likely than other parades to have their permission to use the streets conditioned on gathering a minimum number of marchers. The district court agreed, noting that "a review of defendants' permitting decisions over the last few years shows that applications for political and/or protest marches are more likely to garner a minimum participant requirement than are community or sports-related events." This conclusion is borne out by the record, which shows that while not all expressly political or protest marches received such conditional permits, a minimum numbers requirement was disproportionately likely to be imposed on political, as opposed to community or religious, events.

The Coalition brought this action in federal district court, contending that the conduct of Seattle's police officers at the Coalition's 2003 parade violated their free speech and due process rights and that Seattle's Parade Ordinance on its face violates the First Amendment to the U.S. constitution, as well as provisions of the Washington state constitution. On cross-motions for summary judgment, the district court held that the Parade Ordinance does not violate the First Amendment on its face. The parties agreed to settle the Coalition's free speech claim as applied to the officers' conduct during the 2003 parade, and so all that remains before us on appeal is the facial challenge. We review the district court's decision on cross-motions for summary judgment de novo. *Arakakai v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). We reverse.

## II.   Seattle's Parade Ordinance

Before we consider the Coalition's First Amendment challenge to the Parade Ordinance, we address the extent of the authority the Ordinance confers. The Parade Ordinance is fairly terse, but the scope of the Chief of Police's authority is clear. First, the Chief of Police has no authority to deny a parade permit. *See* SMC 11.25.020 ("Upon written notification . . . the Chief of Police *shall grant* a permit." (emphasis added)). Second, the permitting requirement applies to any

"parade upon any street or alley." *Id*. Elsewhere, Seattle defines a "parade" to include "any organized movement or march of persons and/or things which requires the closure of streets to prevent a conflict with the regular flow of vehicular traffic." SMC 11.14.410. Third, the Parade Ordinance gives the Chief of Police the discretion to modify the parade in various ways, including by changing the "proposed line of movement or march." SMC 11.25.020. Although Washington courts have not provided any authoritative interpretation of the Parade Ordinance, the Seattle Chief of Police has interpreted his authority to alter the "proposed line of movement or march" to include the authority to require marchers to use the sidewalks in lieu of the streets and to require marchers to obey traffic signals.

The Coalition suggests that we may avoid the constitutional question if we conclude that placing marchers on the sidewalks, whether the marchers are required to obey traffic signals or not, amounts to a constructive and impermissible denial of a parade permit because a "parade" under Seattle law occurs only when there is a "closure of the streets." Because Seattle law requires parade permits to be conferred as of right, the Coalition contends, the Chief of Police has no authority to place parades onto sidewalks. Seattle responds that sidewalk marches can also be parades under Seattle law because they may require some closure of the streets, such as when police provide traffic control at intersections or close a lane of traffic so that they can safely escort marchers. Thus, Seattle argues, sidewalk marches are merely rerouted parades, not complete denials of parades. The Coalition conceded that during the Coalition's 2003 march, when the marchers were compelled to remain on the sidewalk, police officers occupied a lane of traffic throughout the march and marchers were required to obey some traffic signals, but not others.

We agree with the Coalition that a constructive denial of a permit could occur if police officials confined marchers to the sidewalk without providing a street escort or other police ser-

vices, and that such a denial would be open to challenge on an as-applied basis. We agree with Seattle, however, that the Parade Ordinance on its face does not limit the Chief of Police's authority to "modify . . . the proposed line of movement" of the march by placing marchers on sidewalks. If police close a lane of traffic for safety reasons or otherwise provide traffic control during the march, then marchers receive a privilege not accorded to non-marching pedestrians. Therefore, the Chief of Police has authority under the Parade Ordinance to alter the parade route by requiring marchers to use sidewalks instead of streets.

### III.   Facial Challenge Under the First Amendment

To determine whether the Parade Ordinance complies with the requirements of the First Amendment, we must first decide whether the Coalition may properly bring a facial challenge to the Ordinance. We conclude that it may.

The Coalition does not question Seattle's authority to require parade organizers to obtain a permit in advance of holding a street parade, and the constitutionality of such permitting schemes is well established. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("[The] government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally." (citations omitted)). The Coalition also does not dispute that Seattle may issue such permits subject to reasonable time, place and manner restrictions, including restrictions on the start time or route of the march. Rather, the Coalition principally argues that the Parade Ordinance violates the First Amendment because it fails to provide sufficient guidance to the police as to when they may require marchers to use the sidewalks and deny them access to the streets. This lack of guidance, in the Coalition's view, is compounded by the absence of any requirement that the police officials articulate their reasons and the absence of any administrative or judicial review mechanism. This, the Coali-

tion contends, creates an unacceptable risk that officers will arbitrarily modify certain groups' permits by prohibiting them from marching in the streets based on the content of their speech.

**[1]** Facial challenges are generally disfavored, both because they may require us to pass judgment on a statute that has not been implemented and because a ruling of unconstitutionality undermines the democratically expressed will of the people. *See Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191 (2008). The Supreme Court, however, has "long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially," even when that person has neither applied for nor been denied a license. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988). This is so for two reasons. First, the Court has recognized that, even as to permitting schemes that are content neutral on their face, "the mere existence of the licensor's unfettered discretion" may intimidate parties into self-censoring their speech, and such self-censoring effects are incapable of redress through an as-applied challenge. *Id.* at 757-58. Second, and particularly relevant here, "the absence of express standards makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *Id.* at 758.

**[2]** The Parade Ordinance is susceptible to the Coalition's facial challenge because the Ordinance would be similarly subject to abuse and the attendant dangers of self-censorship if it confers unfettered discretion on the Seattle Chief of Police or his subordinates. The exclusive purpose of the Ordinance is to regulate constitutionally protected expressive activity, thereby creating a greater danger of both censorship and self-censorship than laws of general applicability that may incidentally be misused to burden expression. *See id.* at 760-61. The danger of abuse is acutely presented in this case,

where the speech the Coalition seeks to engage in — protesting police brutality — is directly critical of the governmental body that administers Seattle's permit scheme. Recognizing such kinds of risks, both the Supreme Court and we have repeatedly allowed plaintiffs to bring facial challenges to permitting schemes that regulate expressive activity. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320 (2002) (park permit scheme); *Forsyth County*, 505 U.S. at 131 (assembly and parade fee scheme); *Plain Dealer*, 486 U.S. at 755 (newspaper rack permit scheme); *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1019 (9th Cir. 2008) (event permit scheme); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 (9th Cir. 2006) (community event permit scheme); *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1068-70 (9th Cir. 2006) (sign permit scheme).

**[3]** That the Ordinance authorizes only a "modification" of a parade permit by rerouting marchers from the streets to the sidewalk, not an outright denial of a permit, does not preclude a facial challenge. We must look to the implementation of the Ordinance to ascertain whether the City has in practice narrowed the Ordinance in a way that remedies any potential overbreadth and precludes constitutional challenge. *See Forsyth County*, 505 U.S. at 131; *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989); *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998). Upon examination, not only has the City failed to narrow the Ordinance's scope in practice, but it has implemented the Ordinance at times in a way that expands it even beyond what the City now claims its scope to be. Significantly, the Seattle police have been enforcing the Ordinance as though it authorized *denying* permits (relegating marchers to the sidewalks as normal pedestrians), although the City has repeatedly claimed that all permits must be granted. For example, the police department has issued permits with the following kinds of restrictions: "If there are less than 200 participants, the participants will use sidewalks and obey traffic control signals." "Permit on condition of

500+ participants." "If event organizers are unable to have 200+ participants, the Field Incident Commander has the ability to *re[s]cind* this permit and have the group utilize the sidewalk."(emphasis added). By their own description, therefore, the Seattle police have rescinded permits if minimum numbers determined by the police — not conditions in the Ordinance itself — are not met. When such permits are "rescinded," the marchers are required to proceed on the sidewalk rather than the street and to follow all traffic signals, just like regular pedestrians, an activity the City has conceded does not require a permit. The effect of such a rescission, therefore, is tantamount to a constructive denial of a parade permit.[3]

**[4]** The implementation of the Ordinance by the Seattle police thus demonstrates the appropriateness of a facial challenge in two ways: First, as applied the Ordinance seems to be more akin to a permit scheme that allows the deciding official to grant *or deny* a permit for speech than to a system allowing mere modifications to the conditions under which speech is allowed. Second, taking the City at its word that the intention of the Ordinance was to guarantee "parade" permits to all applicants, the fact that the police believed themselves authorized to transform a parade into a group walk on the sidewalks illustrates that the Ordinance contains no readily apparent guidelines.

**[5]** Furthermore, by routing marchers onto sidewalks, Seattle undoubtedly "den[ies] use of a forum in advance of actual expression," namely, the streets. *See Ward*, 491 U.S. at 795 n.5 (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)); *see also Long Beach Area Peace Network*, 522 F.3d at 1027 (considering facial challenge to ordinance that allowed officials to "restrict[ ] events to city sidewalks, por-

---

[3]The Dissent, at footnote 3, misses the point of our citation of these examples, which simply demonstrate that the City does in fact constructively deny parade permits.

tions of a city street, or other public right-of-way" (internal quotation marks omitted)). The public streets are "the quintessential traditional public fora," as the Supreme Court has long recognized. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 676 (1992); *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 579 (1995) ("Having availed itself of the public thoroughfares for purposes of assembly [and] communicating thoughts between citizens, the [petitioner] is engaged in a use of the streets that has from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." (internal quotation marks omitted) (first alteration in original)). We have accordingly held that streets and sidewalks are distinct forums for speech. *See ACORN v. City of Phoenix*, 798 F.2d 1260, 1266 (9th Cir. 1986) (noting that the Supreme Court has "listed 'sidewalks' separately as an additional example of traditional public fora, rather than as wrapped up in a broad definition of the word 'streets' "). Therefore, even if the Ordinance does not give the Chief of Police the discretion to permit or deny *a permit*, it clearly does give the Chief of Police the discretion to "permit or deny *expressive activity*," namely, a street march. *Plain Dealer*, 486 U.S. at 755 (emphasis added).

We therefore disagree with the dissent's suggestion that the Coalition should not be permitted to bring a facial challenge because Seattle's permit scheme requires officials to make available *another* public forum — the sidewalks — at the same time they deny access to the streets. This would ignore that both the message and the ability to reach an audience are sensitive to the place and method of communication. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (noting that "[d]isplaying a sign from one's own residence often carries a message quite distinct from placing the sign somewhere else, or conveying the same text or picture by other means"); *Santa Monica Food Not Bombs*, 450 F.3d at 1047 ("The ability to communicate a particular message in a particular location can significantly contribute to the effectiveness of that communi-

cation."). Street parades afford greater visibility to the marchers than parading down the sidewalk, and may also allow marchers to proceed abreast, march behind a horizontal banner and more easily distribute materials to pedestrians on both sides of the street. A group such as the Coalition that wishes to claim for itself the unique message of a street march, and that believes a sidewalk parade minimizes its ability to communicate with its audience, therefore might easily be intimidated into censoring its message so as to avoid being rerouted to the sidewalk — for example, by toning down its critique of police brutality so as to avoid unfavorable treatment by the police officials who administer the permits.[4]

If all speech permit schemes were immune from facial challenge simply because they required officials to permit access to *some* forum for speech, legislatures would simply be encouraged to draft their regulations more broadly, sweeping up a broad class of speech and then leaving administrators a free hand to make extensive "modifications" within that class.[5] This would lead to the anomalous result that a statute confer-

---

[4]Further, the Supreme Court has allowed facial challenges to statutes that did not themselves actually give officials discretion to deny a permit, but rather allowed officials the discretion to burden a group's speech differently depending on its message. *See, e.g.*, *Forsyth County*, 505 U.S. at 133 (striking down a statute on a facial challenge where "nothing in the law or its application prevents the official from encouraging some views and discouraging others through *arbitrary application of fees*" (emphasis added)). Thus the complete and explicit denial of any right to speak is not, as the dissent suggests, the sine qua non of the right to bring a facial challenge.

[5]For example, if we adhered to the dissent's proposed distinction, then an ordinance requiring a permit for "a billboard" would be subject to facial challenge, whereas an ordinance requiring officials to issue a permit for "any sign," but allowed officials to "modify" a request for a billboard by approving a two-foot lawn sign instead, would not. Subjecting these two statutes to two different constitutional tests, on the theory that one denies speech whereas the other allows only "modifications" to speech, would hang too much on an inconsequential distinction. In both cases, the individual has been denied permission to put up a billboard.

ring more discretion on administrators would be less suscepti-ble to facial challenge. The danger, moreover, of such a free hand to modify the conditions under which speech is allowed has been demonstrated here: even though the City believes that every permit must be granted, the Chief of Police has interpreted his authority to modify to do so in such a way that it is no longer a parade at all. Without adequate standards to guide official discretion in applying the Ordinance, the risk of such censorship — and self-censorship — is real. Accord-ingly, we hold that the Coalition may bring a facial challenge to the Parade Ordinance.

## IV.   The First Amendment

Having concluded that the Coalition may bring a facial challenge to the Parade Ordinance under the First Amend-ment, we turn to whether the way in which the Ordinance reg-ulates marchers' access to the streets satisfies the requirements of the First Amendment. We hold that it does not.

## A.   Legal Framework

The Supreme Court has emphasized in a long line of cases that robust political discourse within a traditional public forum is the lifeblood of a democracy. *See, e.g.*, *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). The First Amendment "applies with par-ticular force" to a "march and other protest activities," such as the Coalition seeks to engage in here. *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999). This is particu-larly true where the march takes place in the streets, which "have immemorially been held in trust for the use of the pub-lic and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and dis-cussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939); *see also Frisby v. Schultz*, 487 U.S.

474, 481 (1988) ("[A]ll public streets are held in the public trust and are properly considered traditional public fora."). When the government seeks to regulate access to the streets, "First Amendment protections are at their strongest and regulation is most suspect." *Long Beach Area Peace Network*, 522 F.3d at 1021. Because of the special status of traditional public fora in our First Amendment tradition, "the government must bear an extraordinarily heavy burden to regulate speech in such locales." *NAACP, Western Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984).

The Supreme Court has traditionally referred to any permitting scheme as a "prior restraint on speech" that faces a "heavy presumption against validity." *See Forsyth County*, 505 U.S. at 130 (internal quotation marks omitted). The Court, however, has more recently distinguished between schemes that "authorize a licensor to pass judgment on the content of speech" and those whose purpose "is not to exclude communication of a particular content, but to coordinate multiple uses of limited space" on a content-neutral basis. *Thomas*, 534 U.S. at 322. A permit scheme that regulates competing uses of space on a content-neutral basis "differs *toto coelo*" from a traditional censorship regime. *Id*. at 322-23 (internal quotation marks omitted). It therefore "bear[s] a somewhat lighter burden," including that it is not required to meet the extraordinary procedural requirements governing traditional prior restraints. *Santa Monica Food Not Bombs*, 450 F.3d at 1036; *see also G.K. Ltd. Travel*, 436 F.3d at 1082. Licensing regimes whose sole purpose is to regulate competing uses of public space are evaluated "as a content-neutral time, place, and manner permitting scheme." *Santa Monica Food Not Bombs*, 450 F.3d at 1036-37.

The Coalition does not seriously dispute that the Parade Ordinance is a content-neutral time, place and manner regulation, and in fact concedes that the Ordinance is content neutral on its face. Although the Coalition argues that the Ordinance has been used by officials to discriminate on the basis of con-

tent in the past, the reasons for the differential treatment are not sufficiently developed in the record for us to infer they were content based. Further, the Ordinance itself does not instruct the Chief of Police to differentiate speech on the basis of content, and so any content-based discrimination, if it occurred, happened because the Ordinance failed to *prevent* it, not because the Ordinance *required* it. We shall therefore take the Ordinance at face value for purposes of our analysis. *See G.K. Ltd. Travel*, 436 F.3d at 1071 ("[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." (internal quotation marks omitted)).

**[6]** The only question before us, therefore, is whether the Ordinance satisfies the requirements of a valid time, place and manner restriction on speech. To be valid under the First Amendment, "[s]uch restrictions (1) must not delegate overly broad discretion to a government official; (2) must not be based on the content of the message; (3) must be narrowly tailored to serve a significant governmental interest; and (4) must leave open ample alternatives for communication." *Santa Monica Food Not Bombs*, 450 F.3d at 1037; *see also Long Beach Area Peace Network*, 522 F.3d at 1022. We have already accepted the Ordinance as being content neutral, so we focus on the first component: overbroad discretion. If the Ordinance delegates overly broad discretion to police officials, we need not determine whether it satisfies the remaining components of the test. *See Thomas*, 534 U.S. at 323 n.3.

## B.   Overly Broad Discretion

**[7]** To determine whether the Ordinance impermissibly grants "the licensing official . . . unduly broad discretion," we consider whether the language of the Ordinance "contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323; *see also G.K. Ltd. Travel*, 436 F.3d at 1082. Such guide-

lines mitigate the "risk that [the licensor] will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323. Among the factors we consider is whether the Ordinance contains "narrowly drawn, reasonable and definite standards" that guide the hand of the administrator. *Forsyth County*, 505 U.S. at 133 (internal quotation marks omitted). The Supreme Court has expressed particular concern about statutes that do not require the licensor to "provide any explanation for his decision, and [where] that decision is unreviewable." *Id*.; *see also Thomas*, 534 U.S. at 324 (holding that ordinance did not confer excess discretion where the licensor "must clearly explain its reasons for any denial," and where the statute's standards are "enforceable on review" by appeal to an administrative board and then to the state courts). None of these factors is itself necessarily determinative of whether a statute confers excess discretion. Instead, we look to the totality of the factors to assess whether this Ordinance contains adequate safeguards to protect against official abuse.

**[8]** Starting with the language of the Parade Ordinance itself, the Chief of Police may modify parade permits for only one reason: "in the interest of vehicular or pedestrian traffic safety." SMC 11.25.020. Seattle's Chief of Police and the police lieutenant in charge of administering parade permits testified to a variety of circumstances that officials might consider when deciding to place a parade on the sidewalk, including the lighting and weather conditions at the time of the march, the proposed route, any construction or roadway problems along the route, emergency vehicle access, sidewalk widths, the size of the proposed march and whether the march would include vehicles or floats. The articulated list of relevant factors both changed and grew during the course of litigation in the district court, however; at various points, the list ranged from whether "normal citizens [are] trying to spend money and have a meal" on the sidewalk to the dangers a street march would pose to marchers and drivers. Moreover, Seattle never claimed that these factors were enumerated in any official policy; in fact, the police officer responsible for

issuing parade permits said that to his knowledge, these factors were "not spelled out anywhere, [or] written down."

**[9]** In evaluating the facial challenge to the Parade Ordinance, we consider "the [City's] authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth County*, 505 U.S. at 131. The various factors listed by Seattle's police officials do not restrict their discretion, however, unless "the limits the city claims are implicit in its law [are] made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Plain Dealer*, 486 U.S. at 770. We decline to elevate any of the various decisional principles offered by Seattle's officials to the realm of "well-established practice," when no consistent set of factors was ever articulated. Further, some of these principles actually appear to *broaden* official discretion rather than restrain it, such as one officer's understanding that he could place marchers on streets or sidewalks depending on the extent to which their presence would inconvenience customers of sidewalk cafes. These factors, therefore, appear simply to follow from police officials' general belief that they should exercise their duties in a "reasonable" and "good faith" manner. Because Seattle has neither a binding interpretation of the Parade Ordinance nor any well-established practices governing the exercise of official discretion, the only question before us is whether the Ordinance, on its face, provides sufficient guidance to these officials.

Seattle argues that the language of the Ordinance — which states that the Chief of Police may move marchers onto sidewalks only "in the interest of vehicular or pedestrian safety" — provides an adequate standard to guide official discretion. Seattle asserts that this standard confers no more discretion on its face than the standards the Supreme Court approved in *Thomas* and *Cox v. New Hampshire*, 312 U.S. 569 (1941), and that it is narrower than the standard the Supreme Court criticized in *Shuttlesworth v. City of Birmingham*, 394 U.S.

147 (1969). The Coalition argues that this language in fact confers wide discretion, because it allows Seattle to deny a group access to the streets whenever police officials determine it is in the "*interest of* vehicular or pedestrian safety." SMC 11.25.020 (emphasis added). Because nearly every street parade creates potential safety concerns for participants, pedestrians and vehicular traffic, the Coalition contends that virtually any denial of a street parade could be said to be in the "interest of" safety.

[10] We agree with the Coalition that the Parade Ordinance's language provides less guidance to officials than the standards considered in *Cox* and *Thomas*. In *Thomas*, the ordinance allowed the city to deny a permit to use the park if, among other reasons, the activity "would present an *unreasonable danger* to the health or safety" of the public or park employees. 534 U.S. at 319 n.1 (emphasis added). The statute in *Cox*, as interpreted by the state's supreme court, instructed the municipality to license a march, provided "the convenience of the public in the use of the streets would not thereby be *unduly disturbed*." 312 U.S. at 576 (emphasis added). The Parade Ordinance, however, allows officials to restrict marchers' access to the streets whenever such a restriction is in the undefined "interest of" traffic and pedestrian safety. This language gives officials less guidance and more leeway than those standards the Supreme Court and we have previously approved. *See Long Beach Area Peace Network*, 522 F.3d at 1027 (approving statute giving officials the discretion to "restrict[ ] events to city sidewalks, portions of a city street, or other public right-of-way," but only when such restrictions are "*necessary* to . . . protect the safety of persons and property and to control vehicular and pedestrian traffic" (internal quotation marks omitted) (emphasis altered)); *City of Richmond*, 743 F.2d at 1349 n.1 (approving statute that required approval of parade permits unless they would place an "*undue burden* upon the movement of vehicular traffic" (emphasis added)); *see also Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 180 (2d Cir. 2006) (approving statute that, as con-

strued, "allows the official only to consider whether a proposed mass gathering presents *unreasonable* risks to life or health"); *cf. Shuttlesworth*, 394 U.S. at 149-50 (holding that statute granted excessive discretion in allowing the city to deny a parade permit if "in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused").

**[11]** The breadth of the Ordinance becomes particularly troublesome when we consider its failure to require officials to articulate their reasons for denying permission to march in the streets and the absence of any mechanism for direct administrative or judicial review.[6] The Supreme Court's decision in *Thomas* is instructive in this regard. The Court made it quite plain that its acceptance of the standard governing the Chicago Park District's discretion — that the activity "would present an unreasonable danger to the health or safety" of the public or park employees, a standard itself more limiting than Seattle's — rested on two important procedural checks on that discretion missing here: (1) the officials had to state their specific reasons for concluding that there was an unreasonable danger, and (2) their decision was subject to both administrative and judicial review. *See Thomas*, 534 U.S. at 323 ("We have thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision *and*

---

[6]Seattle suggested for the first time on appeal that parade permits could be reviewed on appeal through a separate permitting system that exists for "special events." *See* SMC 15.52.060(D). Special events are events involving more than 50 people that are likely to have a substantial impact on the public place where they are held and require the provision of substantial public services. SMC 15.52.005(A). Special events permits, unlike parade permits, must be sought three months in advance. SMC 11.15.060(A). There is no basis for concluding that parades and special events are synonymous under Seattle law, and Seattle presented no evidence that the terms of parade permits could be appealed under the Special Events Ordinance.

*render it subject to effective judicial review.*" (emphasis added)).**⁷**

Both the Supreme Court and this court have repeatedly recognized that requiring officials to state the reasons for a license denial provides an important check on official discretion by "facilitat[ing] effective review of the official's determination" and "ensur[ing] that the . . . determination is properly limited in scope." *G.K. Ltd. Travel*, 436 F.3d at 1083 (citing *Thomas*, 534 U.S. at 324). We have consistently emphasized the importance of these two checks together, which ensure that officials do not abuse the authority conferred on them by statute. *See, e.g.*, *Thomas*, 534 U.S. at 324; *Forsyth County*, 505 U.S. at 133 (holding parade fee ordinance unconstitutional where the administrator "need not provide any explanation for his decision, and [where] that decision is unreviewable"); *Plain Dealer*, 486 U.S. at 769 (holding a news-rack permitting ordinance unconstitutional in part because "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application"); *cf. Long Beach Area Peace Network*, 522 F.3d at 1027 (permitting scheme not unconstitutional where officials must "provide . . . a written explanation for a decision that imposes conditions on the permit" and where that decision can be appealed to the city council or state court).

**[12]** Requiring officials to state their reasons for restricting speech is particularly important because without a written explanation it is "difficult to distinguish, 'as applied,' between

---

**⁷**The procedural checks of *Thomas* are quite different from the procedural requirements rejected in *Southern Oregon Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004). *See* Dissent at 16400. In *Southern Oregon*, we held that the three specific procedural safeguards placed upon content-based "explicit censorship schemes," established in *Freedman v. Maryland*, 380 U.S. 51 (1965), are not required of content-neutral licensing schemes, but we did not exonerate all such schemes from *any* procedural checks. *See Southern Oregon*, 372 F.3d at 1137.

a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *See Plain Dealer*, 486 U.S. at 758. The Parade Ordinance allows the officials who administer Seattle's permit scheme to deny marchers access to the streets without even the barest expression as to why their march needed to be placed on the sidewalk in the interest of pedestrian and traffic safety. The dissent emphasizes that some of these decisions are made by police on the ground during the parade and suggests it would be impracticable to ask officials to provide a written decision and an appeal right. *See* Dissent at 16399. However, police officers routinely explain discretionary decisions after they occur, and even a requirement of after-action justification would provide an important check on police abuse. Further, and more importantly, the Parade Ordinance *also* gives this same unfettered discretion to the permitting officials who review and grant applications well in advance of parade day. Permitting officials who review, grant and restrict permits could easily produce a written record to enable judicial (and administrative) review and provide disgruntled applicants with the right to appeal.[8] This lack of a written record is a critical defect, because without any record of the rationale for the decision, "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting

---

[8]We agree with the dissent that wider discretion may be more appropriate for the police on the scene than the officials who grant permits, because officers on the ground may be confronted with unexpected conditions at the time of the parade and be required to make instantaneous decisions. The officials who grant permits in advance, however, do not face these exigencies. The dissent does not contend that the Ordinance can or should be construed to apply *only* to the police on the ground, and the Ordinance cannot be saved from facial invalidity when it confers excess discretion on administrators who face no obstacles to providing a written explanation with an appeal right. We express no opinion as to whether a revised ordinance conferring discretion *solely* on the police officers escorting the parade would need to meet the same requirements as those governing the initial permitting decision in order to satisfy the First Amendment.

favorable, and suppressing unfavorable, expression." *Plain Dealer*, 486 U.S. at 758. It is therefore no answer to say that any abuse of the police officials' authority can be remedied on a case-by-case, as-applied basis, when the Ordinance itself makes such after-the-fact review ineffectual if not impossible.[9]

[13] This problem is highlighted here, where the Coalition presented evidence that political and protest marches disproportionately received parade permits that conditioned their use of the streets on the appearance of a certain number of marchers. *See Long Beach Area Peace Network*, 522 F.3d at 1043 (noting that evidence suggesting favoritism is "a manifestation of the very dangers inherent in unbridled discretion"). We need not decide whether any of these decisions to place marchers on the sidewalk was an abuse of the police chief's discretion. *See Forsyth County*, 505 U.S. at 133 n.10 ("Facial attacks on discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision . . . . [T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but *whether there is anything in the ordinance preventing him from doing so*." (emphasis added)). It is entirely possible that each of these decisions was dictated by an articulable interest of traffic and pedestrian safety, and that there exists a neutral and non-content-based explanation for this pattern of permitting decisions. However, the very absence of clear standards in the Parade Ordinance, the lack of any decision-making trail for us to review and the absence of any administrative appeals

---

[9]The dissent argues that the Coalition's now-settled as-applied challenge that Seattle modified parade permits for parades with a political message demonstrates that as-applied challenges are enough to remedy any potential violations of discretion. We believe the lawsuit demonstrates the precise opposite, that only a systemic pattern of discrimination against political groups, shown by cataloguing hundreds of marches to uncover a recognizable pattern, can weigh against so vague a standard as "in the interest of vehicular and pedestrian safety."

process underscore the obvious risk that officials could engage in content-based discrimination that would be effectively immune from judicial scrutiny. It is this very risk of abuse that is intolerable under the First Amendment.

## CONCLUSION

**[14]** The Parade Ordinance's open-ended standard, combined with the absence of a requirement that officials articulate their reasons or an administrative-judicial review process, vests the Seattle Chief of Police with sweeping authority to determine whether or not a parade may utilize the forum of the streets to broadcast its message. The First Amendment prohibits placing such unfettered discretion in the hands of licensing officials and renders the Parade Ordinance constitutionally defective on its face. *See, e.g.*, *Thomas*, 534 U.S. at 324. We therefore need not resolve the other questions presented by the Coalition, such as whether the Ordinance otherwise satisfies the requirements of a valid time, place and manner restriction and whether it is also invalid under the Washington state constitution. We reverse the grant of summary judgment to Seattle.

**REVERSED**.

---

IKUTA, Circuit Judge, dissenting:

Seattle requires the Chief of Police to grant a parade permit to anyone who applies for one. SMC 11.25.020.[1] The Chief of

---

[1]The ordinance states:

No person shall conduct or participate in a parade upon any street or alley in the City without first submitting a written notification to the Chief of Police and obtaining a permit from the Chief of Police to do so. Upon written notification to the Chief of Police, the Chief of Police shall grant a permit. So that preparations for

Police has authority only to modify the parade's place, time, and proposed line of movement or march "in the interest of vehicular or pedestrian traffic safety." *Id.* Because Seattle defines "parade" as always involving some "closure of streets to prevent a conflict with the regular flow of vehicular traffic," SMC 11.14.410, anyone with a parade permit is entitled to some use of the city streets. Seattle's routine effort to coordinate parade activities with public safety concerns is a garden-variety content-neutral time, place and manner restriction. And yet the majority holds that the routine authority to reroute a march for vehicular and pedestrian safety is actually a grant of standardless discretion to deny First Amendment rights which must be struck down as facially unconstitutional.[2]

---

traffic regulation can be made, the written notification for permit shall state the place and hour of formation, the proposed line of movement or march, the scheduled starting time, and the names of the persons having charge or control of the parade, and the name of the sponsoring agency, if any. Such written notification shall be delivered to the Chief of Police at least forty-eight (48) hours before the parade is scheduled to begin: Provided, that the forty-eight (48) hour time limit for written notification may be waived by the Chief of Police if, at the time the written notice is submitted, the Chief of Police anticipates being able to make reasonable preparations for the parade within less time than forty-eight (48) hours. The Chief of Police may modify the place and hour of formation, the proposed line of movement or march, and the scheduled starting time in the interest of vehicular or pedestrian traffic safety.

[2]As a threshold matter, I doubt the Coalition may properly bring a facial challenge against the ordinance. Because the ordinance does not give the Chief of Police the discretion to permit or deny parade licenses, it does not grant the type of unbridled discretion that has previously caused the Supreme Court to make an exception to its general disapproval of facial challenges. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988). Rather, the Seattle ordinance grants the Chief of Police limited discretion which "is of an entirely different, and lesser, order of magnitude," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), and which does not give rise to the twin evils of self-censorship and inadequate judicial review that are at the center of the Court's rationale for allowing facial challenges on an unbridled discretion theory. *See Plain Dealer*, 486 U.S. at 757. However, even assuming the majority is correct in allowing a facial challenge to go forward, I would hold that the Coalition's challenge fails on the merits. *See Ward*, 491 U.S. at 794.

Maj. Op. at 16392-94. Because this conclusion is not supported by Supreme Court precedent or our case law, I must respectfully dissent.

A

"[I]n order to regulate competing uses of public forums, [local governments] may impose a permit requirement on those wishing to hold a march, parade, or rally." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *see also Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022, 1036 (9th Cir. 2006).

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Ward* 491 U.S. at 791 (internal quotation marks omitted). In addition, a licensing scheme "must not delegate overly broad discretion to a government official." *Santa Monica Food Not Bombs*, 450 F.3d at 1036. A licensing scheme does not vest unbridled discretion in government officials when it is guided by "narrowly drawn, reasonable and definite standards," *Forsyth County*, 505 U.S. at 133 (internal quotation marks omitted), that render an official's decision "subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

The Coalition contends the Seattle ordinance is facially unconstitutional because it grants the city "unbridled discretion" to deny expressive activity. On its face, the Seattle ordinance gives the Chief of Police no discretion to deny, or even to condition, a permit. Rather, the ordinance requires the

Chief of Police to grant every permit request. The Coalition bases its claim that the ordinance is facially invalid on the seemingly modest amount of discretion granted to the Chief of Police: the authority to modify only "the place and hour of formation, the proposed line of movement or march, and the scheduled starting time" and only "in the interest of vehicular or pedestrian traffic safety." SMC 11.25.020.[3] According to the Coalition, the ordinance's traffic safety standard does not meet the Supreme Court's requirements that a licensing scheme contain adequate standards to constrain an official's discretion.

In my view, the Seattle ordinance is far removed from a grant of unbridled discretion. As noted above, the Chief of Police must grant all parade permits and may modify the direction of a parade only on the ground of traffic safety. This ground is "reasonably specific and objective, and do[es] not leave the decision to the whim of the administrator." *Thomas*, 534 U.S. at 324 (internal quotation marks omitted). A court or jury is capable of evaluating whether police officers based traffic safety decisions on objective factors such as the officer's prior experience with such situations or on-the-ground observations of emergent conditions, or were swayed by their

---

[3]The majority has extracted from the record several examples of occasions when the Seattle police rerouted marches to the sidewalk based on the size of the march. There has been no finding that such incidents are representative of Seattle's implementation of the ordinance. Nevertheless, even assuming it is proper to consider such isolated examples in a facial challenge, these incidents support Seattle's position that its ordinance does not grant police unbridled discretion to deny expressive activity for illegitimate reasons. Regardless of the terminology the police informally used in describing their decision to reroute certain marches, the evidence identified by the majority demonstrates that the police allowed each of the proposed marches at issue to go forward. Moreover, the police rerouted marchers to the sidewalk based on the size of the march, a content-neutral criterion that is reasonably related to vehicular and pedestrian safety concerns (i.e., a police officer could reasonably determine that a small number of marchers is less visible to oncoming traffic) and which would be readily subject to review and challenge in court.

personal feelings or prejudices. In an as-applied challenge to discriminatory enforcement of the Seattle ordinance, a plaintiff may introduce evidence and testimony as to the absence of objectively based traffic safety concerns and raise the inference that the officials modified a parade permit for illegitimate discriminatory reasons. Indeed, this point is illustrated by the history of this litigation. The Coalition brought an as-applied challenge to the Seattle ordinance in district court, arguing that Seattle was making modifications to the permit based on the messages of the marchers, rather than "in the interest of vehicular or pedestrian traffic." SMC 11.25.020. Although the parties ultimately settled the as-applied challenge, the record provides no indication that the Coalition was hampered in making its case by a lack of objective and defined standards against which to test the constitutionality of the city's conduct. Given that the traffic safety standard in the Seattle ordinance is sufficiently objective and defined to render city officials' decisions "subject to effective judicial review," *Thomas*, 534 U.S. at 323, the ordinance does not vest unbridled discretion in the Chief of Police.

The majority's conclusion to the contrary is not supported by the Supreme Court decisions that have invalidated permit schemes on a facial unbridled discretion theory. In *Forsyth County*, for instance, the Supreme Court invalidated an ordinance requiring a parade permit applicant to pay a fee for certain costs prior to the issuance of a permit, where "[t]he decision how much to charge for police protection or administrative time—or even whether to charge at all—[was] left to the whim of the administrator." 505 U.S. at 133. Similarly, in *Plain Dealer*, the Court struck down a city ordinance that allowed the mayor to condition the grant of a permit on, among other things, "any other terms and conditions deemed necessary and reasonable by the Mayor." 486 U.S. at 753-54 (internal quotation marks omitted). Finally, in *Shuttlesworth v. City of Birmingham*, the Supreme Court determined that an ordinance was unconstitutional as written because it lacked any measurable, objective standard to guide official discre-

tion. 394 U.S. 147, 150-51 (1969). Members of the governing body "were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.' " *Id.* at 150. All of these cases involved broad and subjective standards that made officials' decisions essentially unchallengeable. By contrast, the standard in the Seattle ordinance, "vehicular or pedestrian traffic safety," is considerably more objective and defined. Indeed, it more closely resembles the ordinance upheld in *Thomas*, which granted park officials authority to deny access to the park only for a limited number of reasons, including that the use "would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public." 534 U.S. at 319 n.1.

The majority asserts that the Seattle ordinance vests too much discretion in government officials because the ordinance lacks two procedural safeguards: First, the ordinance does not require administering officials to state their reasons for undertaking a modification; and second, the ordinance does not provide an administrative review process to challenge modifications on a case-by-case basis. Maj. Op. at 16390-91. While these procedures were included in ordinances the Supreme Court upheld against unbridled discretion challenges, *see Thomas*, 534 U.S. at 324, the Court has never suggested that such requirements are necessary components of a licensing scheme. In *Southern Oregon Barter Fair v. Jackson County*, we explicitly rejected the argument that specific procedural safeguards, such as provisions for prompt judicial review of permit denials, were required in order for a licensing scheme to withstand a facial challenge. 372 F.3d 1128, 1136-38 (9th Cir. 2004).

Nor would a requirement that a content-neutral time, place and manner restriction contain specific procedural safeguards be reasonable, because such procedures may not make sense in every context. Here, for example, decisions regarding permit modifications often occur on the ground, where police are

forced to rapidly respond to emergent and unpredictable conditions such as traffic and weather. Officers at the scene of a parade cannot do their jobs properly and at the same time be obliged to provide an explanation for every tactical decision or an opportunity for administrative appeal.

Indeed, *Thomas* itself does not place any special weight on the procedures included in the ordinance at issue in that case, but rather focuses on whether the standards guiding government officials' exercise of discretion are sufficiently narrow. In analyzing the provisions of the specific ordinance at issue, *Thomas* mentions the procedures relied upon by the majority, but focuses on the grounds on which officials could deny a permit, concluding that the standards "are reasonably specific and objective, and do not leave the decision to the whim of the administrator." 534 U.S. at 324; *see also Ward*, 491 U.S. at 794 (upholding an ordinance that allowed technicians at a concert to adjust the volume of the amplification without requiring a post hoc justification, despite the Court's recognition that the "officials implementing [the ordinance] will exercise considerable discretion"); *S. Or. Barter Fair*, 372 F.3d at 1138-39 (holding that an ordinance requiring permits for certain mass gatherings was facially valid even without a provision for prompt judicial review of permit denials or other procedural safeguards, because the ordinance contained adequate standards to render the administrators' decisions subject to effective judicial review).

In sum, neither Supreme Court precedent nor our own case law supports the majority's elevation of procedural safeguards to central importance in determining whether an ordinance grants officials unfettered discretion. In striking down the Seattle ordinance for failing to incorporate procedural measures, the majority has lost sight of the Court's ultimate question: whether the Seattle ordinance "contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323. Because the traffic safety standard in the Seattle ordinance is

sufficiently defined and objective—certainly as objective as the "unreasonable danger to health or safety" standard upheld in *Thomas*—the ordinance does not vest unbridled discretion in the Chief of Police. The presence or absence of additional procedural safeguards cannot change this conclusion.

B

The Seattle ordinance not only adequately constrains the Chief of Police's discretion, but easily meets the other requirements for a valid time, place, and manner restriction.

First, the Coalition does not dispute that the Seattle ordinance is content-neutral. *See* Maj. Op. at 16385. Second, the ordinance is "narrowly tailored to serve the government's legitimate content-neutral interests," *Ward*, 491 U.S. at 798, namely traffic safety. To be narrowly tailored, the regulation "need not be the least restrictive or least intrusive means" of serving the government interest. *Id.* Instead, it must "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (internal quotation marks omitted). There is no doubt that the government has a significant interest in promoting vehicular and pedestrian safety. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) ("[I]t is clear that a State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." (internal quotation marks omitted)); *ACORN v. City of Phoenix*, 798 F.2d 1260, 1267 (9th Cir. 1986) ("[M]ore so than with sidewalks or parks, courts have recognized a greater governmental interest in regulating the use of city streets." (internal quotation marks omitted)). Seattle's ordinance requires officials to issue permits to all applicants subject to modifications necessary to protect this substantial interest in pedestrian and vehicular safety. Because the ordinance addresses traffic safety issues "without . . . significantly restricting a substantial quantity of speech," *One World, One Family Now v. Honolulu*, 76 F.3d 1009, 1014 (9th Cir. 1996)

(alteration in original) (internal quotation marks omitted), that does not implicate traffic safety issues, it meets the narrow tailoring requirement.

Finally, the ordinance "leaves open ample alternatives for communication." *Santa Monica Food Not Bombs*, 450 F.3d at 1037. The Coalition asserts that by allowing police to reroute parades from the street to the sidewalk, Seattle does not leave open ample alternatives for communication. The majority similarly asserts that the Chief of Police's authority to change the direction of a parade or march gives the Chief of Police "the discretion to 'permit or deny *expressive activity*,'namely, a street march." Maj. Op. at 16382 (quoting *Plain Dealer*, 486 U.S. at 755). I disagree. In my view, the ordinance leaves open ample alternatives for communication even though the Chief of Police may require the parade to march partially on the sidewalk. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (internal quotation marks omitted). Instead, "[t]he First Amendment requires only that the government refrain from denying a reasonable opportunity for communication." *Id.* (internal quotation marks omitted). Here, the Seattle ordinance allows marchers to "reach[ ] their intended audience," *One World One Family Now*, 76 F.3d at 1014, because, whether they are on streets or on the sidewalks, marchers are still visible from the streets. Although the marchers may prefer complete access to the streets because it makes their message more visible, the constitution does not require that speakers have access to the most effective mode of expression. *Id.*; *see also Menotti*, 409 F.3d at 1138 (holding that an ordinance prohibiting protests against the World Trade Organization in an area with greatest access to conference delegates left open ample alternative channels of communication because the protestors could make their protests "visible and audible to delegates, even if not as proximate as the protestors might have liked").

This conclusion is consistent with the rulings of two of our sister circuits, which have held that sidewalks can be a reasonable alternative to the streets. In *Stonewall Union v. City of Columbus*, the Sixth Circuit upheld the constitutionality of a Columbus parade ordinance that imposed a fee on applicants for a parade permit. 931 F.2d 1130, 1137 (6th Cir. 1991). In rejecting the claim that the ordinance violated the constitutional rights of protesters who could not afford the fee, the court held that "the availability of the sidewalks and parks provides a constitutionally acceptable alternative for indigent paraders." *Id.*; *see also Sullivan v. City of Augusta*, 511 F.3d 16, 43-45 (1st Cir. 2007) (upholding an Augusta licensing scheme that imposed a fee for parades because although a sidewalk march might "seem less appealing to some protestors than a street march, it nonetheless provides a prominent route along major thoroughfares for dissemination of a message").

## C

In sum, the Seattle ordinance requires the Chief of Police to grant a permit, subject only to modifications based on "objective," "narrowly drawn, reasonable and definite standards," *Forsyth*, 505 U.S. at 133 (internal quotation marks omitted). Because Seattle's parade-friendly ordinance is an ordinary content-neutral time, place, and manner restriction that does not vest unbridled discretion in the Chief of Police, I respectfully dissent from the majority's determination that it is facially invalid under the First Amendment.